Linda BASS, Plaintiff--Appellant,

v.

James Edward BASS and William David Bass, Defendants--Appellees.

Supreme Court of Tennessee,
at Knoxville.

July 1, 1991.

John Banks, Thomas Banks, Elizabethton, for plaintiff-appellant.

John T. Milburn Rogers, Greeneville, for defendants-appellees.

## OPINION

DROWOTA, Justice.

This case involves an asserted partnership interest in property which ostensibly belongs to, and is claimed by, Linda Bass, Plaintiff–Appellant. Linda Bass has appealed from a decision of the Court of Appeals reversing the trial court's finding that she and William Bass were partners in various business ventures. The trial court found that Linda Bass was the business partner of William Bass, who died unexpectedly in 1986 and, accordingly, awarded her one-half of all partnership assets. The Defendants–Appellees are James Edward Bass, who is the co-administer of William Bass' estate, and William David Bass, the deceased's minor son. The sole issue in this appeal is whether the evidence is sufficient to establish that Linda Bass and William Bass were implied business partners, entitling her to one-half of the assets of the partnership. We hold that the record indeed supports such a conclusion and, therefore, reverse the Court of Appeals and reinstate the judgment of the trial court.

For the most part, the essential facts in this litigation are not disputed. In 1974,

Linda Bass and William Bass began dating each other and, in 1975, started to live together in Elizabethton. When they first started living together, she was employed full-time and he was unemployed, his only income being a small unemployment check. The Plaintiff and William Bass "just joined [their incomes] together and paid bills and bought food and things." A year later, the deceased acquired the State Line Truck Stop, a restaurant located in Mountain City, and he and the Plaintiff moved to that community in 1976 to operate the restaurant.

The Plaintiff initially operated the restaurant by herself, working 17 hour days taking orders, cooking meals, cleaning, and running the cash register. Meanwhile, William Bass worked at a beer store in Mountain City, but eventually quit in order to work at the restaurant. When William Bass began working at the restaurant, he and the Plaintiff each worked 12 hour shifts in order to keep the restaurant open 24 hours a day. Linda Bass was not compensated for her efforts at the restaurant, although she worked there extensively from 1976 to 1981, when the restaurant burned. During the time that Linda Bass worked at the restaurant, William Bass started a video amusement game business and completed six weeks of schooling on how to operate such a business.

The Plaintiff and the deceased were married in 1980, but divorced that same year. Immediately after the divorce, they resumed living together in Elizabethton and worked at the video game business as that enterprise began to prosper. William Bass eventually built a substantial home on his property in Elizabethton and purchased a convenience market and a used car business in the area. The parties resided in the home from 1981 until his death in 1986.

During this period of time, the video game business continued to become more and more profitable, having 60 to 65 video machines in 18 locations in Elizabethton, Mountain City, and North Carolina.[1] The Plaintiff would assist William Bass in the daily servicing of the video machines, help decide where new machines should be located, and kept most of the records of the various businesses. Although she was not listed as a partner or co-owner of any of the businesses, she wrote and signed most of the checks for the operation of the businesses, worked on the machines, and collected money from them (sometimes more than once a day). She was not paid a salary or wages for her efforts. The Plaintiff testified that she recognized that the checking accounts, savings account, safety deposit box, and real property were all listed in William Bass' name exclusively.

When William Bass died intestate in 1986, the Plaintiff and the deceased's brother, James Edward Bass, were appointed co-administrators of the estate, and each subsequently petitioned to have the other removed from that position. The Plaintiff also filed a complaint seeking to have herself declared the surviving spouse of William Bass, or in the alternative, a business partner of the decedent, or the equitable owner of one-half of the assets of his estate. The trial court initially addressed only the first theory proffered by the Plaintiff, finding that William Bass intended to mislead her and third parties as to their marital status. As a result, the trial judge ruled that the parties were estopped from denying the marital relationship. The Court of Appeals reversed and remanded in *Bass v. Bass*, 774 S.W.2d 170 (Tenn.App. 1987), and this Court denied Linda Bass' application for permission to appeal.

---

1. At the start of the relationship involving Linda Bass and the decedent in 1973–74, the decedent owned only a sparsely furnished mobile home. At his death, he owned and had title in his name a three-bedroom, two bath house with a full basement, valued at approximately $60,000.00. He also owned the land and building on which his convenient store was located, approximately 65 commercial amusement machines, including pool tables, jukeboxes, and video games, had deposits of approximately $52,000.00 in the Johnson County Bank, $40,000.00 in the Citizen's Bank of Elizabethton, and slightly more than $17,000.00 in a safety deposit box. He also owned an automobile sales business that he had established shortly before his death. The Court of Appeals found that "all of the assets titled in the name of William Bass at the time of his death were acquired during his twelve-year liaison with [Linda Bass]."

Upon remand, the trial court, without hearing additional proof, addressed the Plaintiff's claim that she had been the business partner of the deceased and, as such, was entitled to one-half of all partnership assets. The trial court found in her favor, holding that she and the decedent had in fact operated the restaurant and the amusement game business as partners. One-half of all partnership assets, including those assets purchased with the proceeds of the restaurant and the amusement game business, were held to be the property of the Plaintiff. After additional appellate proceedings (which are not germane to the case in its present posture) were litigated, the intermediate appellate court held that there was no evidence that the parties agreed to become partners, or that they considered themselves to be partners. Accordingly, the Court of Appeals reversed the trial court's finding that Linda Bass and William Bass were business partners. This appeal followed.

## I.

■ In Tennessee, a partnership is defined as an association of two or more persons to carry on as co-owners a business for profit, T.C.A. § 61–1–105(a), and the receipt of a share of the profits of that business is prima facie evidence that a partnership exists, T.C.A. § 61–1–106(4).[2] In determining whether one is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties. *Roberts v. Lebanon Appliance Service Co.*, 779 S.W.2d 793, 795 (Tenn.1989). If the parties' business brings them within the scope of a joint business undertaking for mutual profit—that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them—the result is a partnership whether or not the parties understood that it would be so. *Pritchett v. Thomas Plater & Co.*, 144 Tenn. 406, 232 S.W. 961, 969–70 (1921).

■ Moreover, the existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64, 67 (1955). Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. *Wyatt*, 281 S.W.2d at 67. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. *Roberts*, 779 S.W.2d at 795–96. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship. *Wyatt*, 281 S.W.2d at 67. Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.[3]

---

**2.** Receipt of profits gives no rise to an inference of a partnership relationship if received as payment for a debt, wages or rent, an annuity to a surviving spouse or representative of a deceased partner, interest on a loan, or as consideration for the sale of a business. T.C.A. § 61–1–106(4)(A)–(E).

**3.** "The intent of parties to form a partnership may be implied; it need not be expressed in writing or orally, if it can be derived from the parties' actions. [I]t may be asserted objectively from all the evidence and circumstances. It is not essential that the parties know that their contract, in law, creates a partnership. The legal effect of the parties' agreement, not their subjective intent, determines whether there is a partnership.

Where parties agree on all matters which, in law, constitute a contract of partnership, it will be presumed that they intend that contract, notwithstanding that the parties propose to avoid the liability otherwise attaching to partners, intend to avoid partnership, or even expressly stipulate that they are not partners. The legal effects of their relationship follow whether or not the parties foresee and intend them, and it is immaterial that the parties do not realize they are partners." 59A Am.Jur.2d, *Partnership*, § 152 (1987).

Creation of a business partnership was recognized by the Supreme Court of Washington in a case involving facts similar to those presented in the present case. In *In re Estate of Thornton*, 81 Wash.2d 72, 499 P.2d 864 (1972), Lucy Antoine and Ray Thornton lived together continuously in a family relationship from 1953 until 1969. 499 P.2d at 865. The couple began raising cattle and, from the profits of that operation, purchased additional property on which a prosperous cattle raising business was started. The property and assets of the business were titled solely in Ray Thornton's name, and he controlled all monies "received and expended on the farming operation through a checking account upon which he alone could draw." *Id.* Antoine participated in the decisions concerning both the farm's management, and in the day-to-day operations thereof. Furthermore, she would write checks needed for the operation of the business, although Thornton would sign the checks. *Id.* When Thornton died in 1969, Antoine asserted a claim, alleging the existence of a partnership interest in the business.

The Supreme Court of Washington stated that the issue was "whether the surviving member of a couple living in a meretricious relationship may prove the existence of a partnership or joint venture agreement involving business property, ostensibly or seemingly owned by the deceased partner, by showing the surrounding circumstances and the acts of the couple, rather than by proving the existence of an express contract of partnership." *Id.* at 865. In finding that Antoine had established a prima facie case of implied partnership, the court noted that she worked hard in the cattle raising project over a period of 16 years and that her efforts significantly contributed to the success of the business venture. The court explained that "[s]he and Ray Thornton jointly contributed their labor to the cattle and farming enterprise; the evidence reveals that they shared in the decision making concerning the enterprise; and, necessarily, they benefited jointly from the profits thereof. From the circumstances of their relationship and their acts in the management of the farming busi-

ness, the existence of a contract of partnership can be inferred." *Id.* at 868. Significantly, the Washington Supreme Court differentiated cases involving an asserted right to share in property by virtue of a couple living together in a meretricious relationship, from a situation where the asserted right is predicated upon a partnership interest in a business for profit. *Id.* at 868. In the latter situation, the court recognized that the ordinary laws of partnership apply, and that a contract of partnership can be implied from the facts and circumstances of the case, a meretricious relationship notwithstanding.

A similar result was reached in *Johnson v. Graves*, 15 Tenn.App. 466 (1932). In *Johnson*, the plaintiff and Henry Johnson had lived together for more than 20 years prior to Johnson's death. The proof revealed that the couple held themselves out as husband and wife, and that 20 years prior to his death, they combined their labor and money into a common fund, from which they ran a business consisting of a boarding house and barber shop. The plaintiff ran the boarding house located above the barber shop, and did laundry work for the barber shop, in addition to cleaning it up. *Johnson*, 15 Tenn.App. at 472. She also handled funds related to these businesses. *Id.* at 473. After Johnson died, the plaintiff asserted a claim predicated upon a partnership theory. When the case was tried, a jury concluded that the parties had entered into a partnership for the purpose of renting a building and operating a boarding house and barber shop, pooled their earnings, and invested the profits. Accordingly, she was awarded one-half of the business assets subsequent to the death of Johnson. *Id.* at 469.

On appeal, the estate took the position that the contract of partnership was tainted by the illicit cohabitation between the parties. *Id.* at 469. The Court of Appeals disagreed, holding that the fact that the parties may have been involved in a meretricious relationship does not prevent the recovery by one partner against the partnership for money or property due them. *Id.* at 476. The court explained that the

plaintiff rendered valuable services in running the boarding house and barber shop for a period of many years. She washed towels for the barber shop, scrubbed the floors, and maintained the rooms that were rented to customers.

■ The obvious implication to be drawn from the *Johnson* and *Thornton* decisions is that an individual should not be denied the opportunity to establish the existence of a *business* partnership into which they, like any other competent individual, may enter into, whether or not cohabitation exists.

## II.

With the foregoing principles in mind, we cannot agree with the analysis employed by the Court of Appeals in this case. The intermediate appellate court held:

"We find no evidence that these parties agreed to become partners, or that they considered themselves to be partners. The business licenses were issued to and in the name of the decedent only. The bank accounts were in his name only. [Linda Bass] was given the authority to sign the decedent's name to checks, and she made various purchases from time to time for herself, for the decedent and for the businesses.

We find no evidence, as stated, that [Linda Bass] shared any profits in the various businesses, or that she expected to. There is no evidence that she conceived herself to be a partner. The record reveals that the decedent alone purchased the amusement devices, and that he alone contracted for their placement; she incurred no business obligations, borrowed no funds, acquired none of the assets necessary for the businesses, and disposed of none. As we read this record, she may well have been treated shabbily by the decedent, but a plenary remedy was readily available to her if she conceived herself to have been unpaid for personal services. We do not agree that the elevation of her to the lofty partnership plateau is a justifiable retribution."

■ Contrary to the opinion expressed by the Court of Appeals, there is ample evidence in the record to support the disposition of this case made by the trial court. There is no question that the Plaintiff and William Bass carried on as co-owners of a business for profit. The parties pooled their money to purchase "food and things," to pay bills and, most importantly, to lease the restaurant. This was done, initially at least, while the Plaintiff was working full-time and the deceased was unemployed. The implication is that the Plaintiff made a significant financial contribution, particularly when the couple began the first business, the restaurant. Moreover, the proceeds from the restaurant business were used to birth the video machine venture, and the profits from this undertaking were used to buy the convenience store. When asked about who kept up with the financial aspect of the businesses, Linda Bass stated that "mostly, we took care of it together." The uncontroverted evidence before the trial court was that all income from the businesses was pooled and that the Plaintiff received whatever was necessary from those funds to maintain her standard of living. Similarly, Plaintiff, by virtue of her reliance on the pooled funds, necessarily incurred business obligations whenever expenditures were made from those funds. Linda Bass shared in the profits of these businesses, in that she had all of the advantages and obligations of running the businesses.

Aside from making a financial contribution and sharing profits, the Plaintiff invested considerable time and labor into operating both the restaurant and the video machine businesses. Initially, the Plaintiff worked 17 hours each day at the restaurant, by herself, taking orders, waiting on tables, cooking, cleaning, and running the cash register. Eventually, the Plaintiff's sister helped her, and she, unlike the Plaintiff, was paid wages for her labor. After the deceased started working at the restaurant, he and the Plaintiff kept it open 24 hours a day, each working a 12 hour shift. The Plaintiff was not paid wages or a salary then either. As far as the video business is concerned, the Plaintiff participated

in decisions regarding the placement of the 60 to 65 video machines (spanning 18 different locations in Elizabethton, Mountain City, and North Carolina), accompanied the deceased on business calls and on trips to purchase new machines, and on service calls. She picked up parts for the machines, serviced and cleaned them, and collected the money that accumulated, sometimes more than once a day. Additionally, the Plaintiff kept the financial records for the businesses, writing the vast majority of the checks, taking care of the daily bookkeeping work, as well as most of the banking business.

It is of little or no consequence that the Plaintiff and the deceased did not formally regard themselves as "partners." *Roberts*, 779 S.W.2d at 795–76. As we have pointed out previously, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money. This is precisely what the parties involved in this case did. It was through the joint efforts of William Bass and Linda Bass that the businesses prospered. That prosperity was due in equal part to the effort of Linda Bass. The proof at trial was abundantly clear as to the labors of the Plaintiff in the various businesses of the deceased. The record is replete with statements by various witnesses that she and the deceased both operated the truck stop and the video game business. The record also contains testimony that the Plaintiff and the deceased were on "equal footing" in the operation of the businesses.[4] Even after William Bass died, money from the amusement machines was still taken to the Plaintiff so that it could be deposited into a bank account. In view of all of these circumstances, we have little difficulty concluding that the Plaintiff and the deceased were implied partners, and that the trial court had ample proof upon which to so find.

The fact that the parties cohabited, and were married at one point, has absolutely no bearing whatsoever in our decision today. A partnership can be implied in this case while completely ignoring the parties' social relationship. If these parties had, for example, been brothers, it is doubtful that there would have been any question raised to begin with about whether a partnership existed. As recognized by the Supreme Court of Washington in *Thornton*, the ordinary laws pertaining to partnership, not the laws of domestic relations, apply in a situation such as this where a *business* partnership can be implied from the facts and circumstances, a meretricious relationship notwithstanding. The fact that the parties may be involved socially should not, and does not, slam shut the courthouse doors to a claimant such as Linda Bass who invests time, money, labor, and energy into establishing a profit producing enterprise. This Court takes the view that the claimant's rights under such circumstances are predicated upon established business partnership doctrine, nothing more and nothing less.

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and that of the trial court is reinstated. This matter is remanded to the trial court for any further proceedings which may be necessary. Costs of this appeal shall be taxed to the Defendants.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.

---

**4.** The following discussion took place between Linda Bass and counsel: "Question: You have alleged a partnership in your complaint, is that correct? Answer: Yes, sir. Question: Did you all ever reach any sort of agreement concerning a partnership? Answer: Just like I said, if there was a machine we wanted to buy and a location we wanted to set it, we discussed it, we took it, and set it in that location. Question: You are saying that you were on equal footing in this, right? Answer: Yes."